916 A.2d 357

Darnell **FIELDS**

v.

**STATE of Maryland**

**Clayton Damon Colkley**

v.

**State of Maryland.**

**Nos. 751, 753 Sept. Term, 2005.**

Court of Special Appeals of Maryland.

Feb. 2, 2007.

500

502

Brian L. Zavin, Baltimore, MD, Brian L. DeLeonardo, Reisterstown, MD (Nancy S. Forster, Public Defender, on brief, Baltimore, MD), for appellant.

Shannon E. Avery (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, MD, for appellee.

Panel: DAVIS, KENNEY, and CHARLES E. MOYLAN, JR. (retired, specially assigned), JJ.

DAVIS, Judge.

## STATEMENT OF THE CASE

Appellants, Darnell "Pooh" Fields and Clayton "Coco" Colkley were charged with the first-degree murder of James "Buck" Bowens, the attempted first-degree murder of Yvette Hollie and William Courts, the first-degree assault of Hollie and Courts, conspiracy to murder Courts and related weapons offenses. Trial was conducted from March 24, 2005 to April 1, 2005 in the Circuit Court for Baltimore City (Glynn, J.) and a jury convicted Colkley of the second degree murder of Bowens, attempted first degree murder of Courts and both appellants of the assault of Courts in the first-degree and conspiracy to murder Courts, the use of a handgun in the commission of a crime of violence and the unlawful wearing or carrying of a handgun. On May 24, 2005, the court imposed an aggregate sentence of forty-five years for Fields and life imprisonment plus fifty years for Colkley. Appellants appealed their convictions separately which we combine and restate as follows.

## QUESTIONS PRESENTED

1.  Did the trial court err when it received a jury note and never informed appellants, nor defense counsels, of the note, nor of what, if any, response the court would give, thereby denying appellants of the right to be present at a critical stage of the trial and the right to provide input for the court's response to the jury?

2.  Did the trial court err in refusing to dismiss the charges against appellants based on the denial of a speedy trial considering that: 1) there was over a [twenty] month delay between appellants' arrest and trial; 2) the delay was overwhelmingly attributable to the State; 3) appellants continually demanded a speedy trial and argued against continuous postponements; and 4) the prejudice to appellants of such a lengthy period of pre-trial incarceration is apparent and well-recognized?

3. Did the trial court err in refusing to grant Fields' motion for a mistrial when a police officer, in response to a prosecutor's question, indicated that [eight] bags of marijuana had been found at a house where Fields resided, thereby corroborating earlier claims by a State's witness that Fields was a marijuana dealer?

The following issues are presented only by appellant Colkley:

4. Was Colkley tried in violation of Criminal Procedure Article § 6–103?

5. Did the trial court err in admitting irrelevant and prejudicial other crimes evidence as to Colkley?

6. Did the State present insufficient evidence to convict Colkley of conspiracy to commit murder?

Because we answer appellants' first question in the affirmative, we shall reverse appellants' convictions and remand for further proceedings. Although appellants' claims that they were denied the Constitutional right to a speedy trial presents a close question in our view, we affirm the circuit court's denial of appellants' motions to dismiss. For guidance of the circuit court on remand, we shall reach the three questions raised only by appellant Colkley and the third question raised by Fields, affirming the trial court as to those issues.

## STATEMENT OF FACTS

This case emanates from a shooting which occurred in the area of Lafayette Avenue and Port Street in Baltimore City on the evening of May 28, 2003, which left Bowens dead and William Courts and Yvette Hollie wounded. Following the shooting, co-defendants Fields and Colkley were arrested.

Neither Courts nor Hollie identified appellants as the shooters. Courts testified that, at the time of the shooting, he was sitting by himself on the steps of a house in the middle of the 1700 block of Port Street drinking beer and Jack Daniels. Bowens or "Buck" was down the street. At some point, Courts heard a car slam on its brakes. The car was gray and

had "dark tinted" windows. Someone wearing a baseball cap—Courts did not see who as he kept his head down—"hopped out" of the car and shot him. Courts attempted to flee, but fell to the ground and the gunman stood over him and continued shooting. Courts was later taken to Johns Hopkins Hospital, where he was treated for ten gunshot wounds to his chest, stomach, side, back, hip and arm.

Courts subsequently learned that Bowens and Hollie had also been shot and that Bowens had died. Courts did not recall Bowens saying anything to him or to anyone in the gray car prior to the shooting. He also was not acquainted with Colkley or Fields and did not know why anyone, including Colkley and Fields, would want to kill him or Bowens.

Hollie testified that she was visiting friends on Port Street at the time of the shooting. While sitting outside drinking, she heard gunfire coming from the direction of Lafayette Avenue. Hollie attempted to get children playing in the vicinity indoors and, as she did so, she felt a stinging sensation in her right arm and realized she had been shot.

Hollie later gave a statement to Detective Sergeant Darryl Massey (hereinafter Sergeant Massey) in which she indicated that she looked up when the shooting began and saw a person getting out of a car in the middle of the street holding a gun. Hollie also stated that she knew Colkley from when she was a child and would have recognized him had she seen him outside that day. Hollie met prior to trial with Colkley's attorney, Howard Cardin, whom she advised that she did not see Colkley or Fields that day.

The sole witness to identify appellants as the shooters at trial was Jermaine "Polish" Lee. According to Lee, on May 28, 2003, he was sitting on the steps of a vacant house on Port Street drinking beer with Bowens and Courts when an "older model boxed four door" car rapidly pulled around the corner from Lafayette Avenue. Fields was driving the car, which had tinted windows. Lee and his friends were "on point," or on their guard, because of a shooting in January of that year, but Bowens told them to "chill" when he saw that Fields was driving the car. Bowens then approached the passenger side

of the car with his hand "in his dip." At that time, Colkley opened the passenger door and came out of the car "in a falling motion," shooting Bowens in the chest. Bowens ran in the direction of Lafayette and Fields got out of the car and began shooting. The back doors of the car opened, but Lee did not see who got out because he ran away as well.

While fleeing, Lee turned down an alley and made his way to a friend's house to call for an ambulance. He went outside shortly thereafter and found Bowens lying on the ground in front of a store at the corner of Milton Avenue and Lafayette, but left without waiting for the ambulance to arrive.

Lee described Bowens and Courts as his close friends, but did not discuss the shooting with the police until his subsequent arrest where he was held without bail on July 2, 2003. Arrested with two other men, Qonta "Little Guy" Waddell and Broderick "Billy" Campbell, and a juvenile, Lee was charged with multiple handgun and drug offenses. On or around July 23, 2003, Lee informed a corrections officer that he wished to speak to the police and, within a few hours, he was transported to the police department, where he identified appellants as the individuals he saw exit the car on Port Street and shoot Bowens and Courts.

While he was in the Baltimore City Detention Center following his arrest, Lee was contacted by Derrick Tummer, a fellow inmate, who arranged a meeting with Colkley in the prison. At the meeting, although Colkley did not do anything to physically intimidate him, Lee testified that he agreed to sign an affidavit offered by Colkley because Lee "was scared for [his] life." On November 25, 2003, Lee met with Cardin and signed a statement indicating that, before meeting Colkley in the detention center, he had never seen Colkley before.

At the time of trial, the charges against Lee from his arrest in July 2003 were still pending and, additionally, he faced another charge for bringing drugs into a jail facility as well as a violation of probation for distribution of cocaine for which he could receive an additional six years in prison. Lee was unable to post bond until his bail was reduced by fifty percent in November or December of 2003. Lee had not been threat-

ened or expressly promised anything in exchange for his testimony, but Lee admitted that he was "hoping it [would] maybe help [him] out" and evidence introduced at a motions hearing on March 22, 2005 indicated that he told the prosecutor and a detective that he believed he would get a benefit in his cases if he cooperated.

Waddell and Campbell, the men with whom Lee was arrested in July of 2003, recanted at trial statements to the police wherein they implicated appellants in the shooting. According to Waddell, who was given immunity to testify, he was with a woman named Tiffany Smith at a Holiday Inn on Moravia Road in Baltimore on May 28, 2003. Waddell denied that he knew appellants and stated that he was unable to identify either of them.

Within days of the May 28th shooting, Waddell, who admittedly sold drugs in the area of Lafayette Avenue and Port Street, was driving with David Courts, William's brother. David was shot and the car crashed into a bridge abutment. David was killed and Waddell was subsequently arrested and charged with possessing a handgun in the car, made bail and was arrested again on July 2, 2003 with Lee and Campbell.

The following day, Sergeant Massey took Waddell's taped statement, which was played at trial, in which he indicated that he had asked to speak to Sergeant Massey after he was arrested. In the taped statement, he told Sergeant Massey that he witnessed the shooting of Bowens and Courts on May 28, 2003. According to Waddell, he was standing at the "top of the street" when a gray-colored Grand Marquis with a purple roof drove down the street and stopped. Bowens, who was standing next to the passenger side of the car, approached and said, "That's Pooh," referring to Fields, a man Waddell had purchased marijuana from in the past. Four people with guns—Fields from the driver's door, Colkley from the right rear door and a man named "Penguin" from the left rear door [1]—exited the car and began shooting. Waddell hid be-

---

1. Fields, in his brief points out that, although the transcript prepared by the court reporter states that a man named "Penguin" exited the

hind a van during the shooting and, after the gunmen returned to their vehicle and left, he departed without checking on any victims.

From photographic arrays, Waddell identified Colkley and Fields and, from a third array, Waddell identified a man named "Edward," who, he alleged, got out of the rear seat of the car on the driver's side and fired a gun down the street.

Contrary to Sergeant Massey's testimony, Waddell maintained at trial that he was high on cocaine during the entire questioning and could not recall any of his identifications or the recorded account of the shooting. However, he admitted that his motivation for more drugs fueled his desire to get out of jail following his arrest in July of 2003 and, thus, he had a reason to speak to the police.

Waddell subsequently met with Colkley's attorney after obtaining his business card from a fellow inmate. After Colkley's attorney explained that, because he represented Colkley, he could not simultaneously represent Waddell, he asked Waddell to discuss the case and Waddell agreed to talk, stating that, although he knew Colkley, he had not seen him shoot anyone.

Campbell also testified that he was at the corner of Lafayette and Milton "[h]elping someone" on May 28, 2003 and, thus, was not present during the incident at issue. At the sound of gunfire, he then ran North along Milton Avenue in the direction of North Fulton Street.

Campbell was transported to the police station on July 3, 2003 after his arrest with Waddell and Lee, where he gave a taped statement to Sergeant Massey, which was played for the jury. His statement indicated that he was on Lafayette Avenue "looking at a girl's pictures" when a silver Marquis with tinted windows and a burgundy roof turned onto Port Street without slowing down. Bowens and Courts were in the

---

vehicle, a transcript of the interview prepared by the police and contained in the record indicates that Waddell referred to the man by the name "Edwin."

middle of the street and, as Campbell rode his bicycle to the corner, he saw four men get out of the car and shoot down the street; he then jumped off of the bike and leaned against a wall. The driver of the car, who Campbell had been told was a man named "Pooh," had "dreads." The man who alighted from the right rear passenger seat was wearing a yellow shirt. Campbell also heard another person shooting from a different direction and, after the shooting ceased, he saw Courts on the ground with gunshot injuries and learned that Bowens had been shot as well and was around the corner. Campbell denied having a gun that day but acknowledged that a man named Edwin Boyd was there and had also been shot.

In a second statement to the police on July 7, 2003, which was also played at trial, Campbell described the car in which the shooters arrived as a "silver Crown Victorian" with a burgundy roof and identified Fields as the driver and Colkley as the passenger in the back seat wearing a yellow shirt. Campbell denied seeing the other two passengers fire any shots. He heard about twelve shots fired from what he believed was an "automatic revolver," such as "a nine or a thirty-eight," and because some of the bullets came in his direction, he fled. Campbell also identified Colkley from a photographic array.

Campbell testified that he was taken to the police station against his will and told what to say by Sergeant Massey. Sergeant Massey threatened him with a charge of the attempted murder of Boyd to ensure his compliance. Sergeant Massey also told him that his one million dollar bail would not be reduced if he did not cooperate. Sergeant Massey and Detective Kerry Snead, who was present during Campbell's second interview, denied promising Campbell anything, threatening him or telling him what to say in his statement.

After he had been in jail for two months, Campbell's family posted his bail, but he was arrested again in December of 2003 for the attempted murder of a police officer. When he was returned to prison, he arranged through another inmate, whom he identified as Stanley Bronson, to meet with Colkley's

attorney. Colkley, in shackles, along with his attorney, visited Campbell on February 3, 2004.

The State presented evidence that Boyd went to the hospital on his own sometime after the shooting seeking treatment for a gunshot wound to his left eye. In a taped statement to Sergeant Massey on June 13, 2003, Boyd identified Campbell as the person who shot him. A week later, Sergeant Massey received a telephone call from Jack Rubin, a criminal defense attorney, who stated that he was representing Boyd, that Boyd did not know anything about the shooting, and that Sergeant Massey should not contact Boyd directly anymore. Boyd, who the State alleged to have been one of the shooters on May 28, 2003, died prior to trial and, therefore, was unavailable to be called as a witness by either side.

Appellants were arrested on July 9, 2003 and were interrogated at the police station and told by Sergeant Massey that appellants and Boyd were suspects in the May 28th incident. At some point, Fields began crying and said that "he was scared." Field's interrogation was not taped.

Sergeant Massey also informed Colkley that he was a suspect in the shooting. Colkley denied having any knowledge about the incident but admitted that he "knew of" Courts. Colkley also indicated that he was with Rubin and Boyd when Rubin called Sergeant Massey and that Rubin had advised him that Boyd's statement would not be admissible in court because Boyd was a juvenile and his parents were not present during his interrogation. Over objection by defense counsel, Sergeant Massey testified that Colkley stated "several times" that he was "going to beat these bodies." Finally, Colkley denied knowing "Fields or a Poo[h]." However, as Sergeant Massey was escorting Colkley away from the interrogation room, Colkley "yelled" at the door to the holding room in which Fields was located "Yo Yo Poo[h] what you telling them people."

Ballistics evidence recovered from the scene included twenty-six nine millimeter and .45 caliber cartridge cases, three nine millimeter bullets, a .38 or .357 caliber bullet, and a .38 or

.357 caliber bullet jacket. Bullets and cases were found in the middle of the 1700 block of Port Street where Courts was shot, and others, including a number of the nine millimeter cases, were collected further north near the intersection of Port Street and Lafayette Avenue. A bicycle, believed to belong to Campbell, was recovered near the shell cases that were found on Lafayette Avenue. James Waxter, who testified for the State as an expert in firearms identification, had determined that at least four guns had been fired based upon that evidence. Waxter opined that additional guns also may have been fired because insufficient markings on two of the .45 caliber cases and one of the nine millimeter bullets made identification of which gun was used to fire them impossible.

While at the hospital, Bowens, Courts and Boyd were tested for gunshot residue. The test for Bowens came back negative, but Courts and Boyd were found to have gunshot residue on both of their hands. Bowens' autopsy, performed by Dr. Zabiullah Ali, indicated that he was killed by a single gunshot wound to the right side of his chest. Sergeant Massey testified that the bullet was a nine millimeter.

The sole witness called by the defense was Colkley who testified that, in May 2003, he was living at 2648 North Port Street and working at Eastside Tire installing car stereos. He denied being in the 1700 block of Port Street on the evening of May 28, 2003, or taking part in the shooting. Colkley also denied saying anything to Fields at the police station following their arrest and testified that he told Sergeant Massey that he knew a man named Pooh, but did not know him by the name of Darnell Fields. Colkley, who was twenty-nine years old at the time of trial, admitted that he had been convicted of selling drugs between his 18th and 19th birthdays.

Colkley met Tummer while awaiting trial and found out that Tummer also had a case pending involving Lee. Colkley arranged to meet with Lee upon learning that Lee informed Tummer that Colkley had nothing to do with the shooting. At the meeting, Lee agreed to give a statement to Colkley's

counsel to that effect. Additional facts will be provided as warranted.

## DISCUSSION

### I

■ Appellants initially claim that the trial court erred when it received a jury note and never informed appellants, nor their defense counsel, of the note, or of what, if any, response the court would give, thereby denying appellants their right to be present at a critical stage of the trial and their right to provide input for the court's response to the jury.

The official record contains a note, not reflected in the transcripts, apparently from juror number seven, marked as "Court's Exhibit # 4." The juror note asks the following questions: "Where [sic] there different kinds of shell casing or How many different gun [sic] were used during the shooting." The note further asks "Was the same gun use to shoot all [of] the victims."

Appellants contend that neither they nor their counsel were aware of this communication and, as such, were not given a chance to be present during this communication, if any, between the jury and the trial court. Further, they were unaware of what, if any, response the Court gave to the jury to address this note. Because appellants and their trial counsel were completely unaware that this juror note was submitted to the court, appellants could not have made a knowing and intelligent waiver of their right to be present or to be represented by counsel during this critical stage. Thus, as the record is absolutely silent on how this note was handled by the court, it is clearly reversible error.

In support of this assertion that they had an absolute right to be present at "every stage of the trial," they cite Md. Rule 4–326(d), Articles 5 and 21 of the Maryland Declaration of Rights, the Sixth and Fourteenth Amendments of the United States Constitution and Maryland common law. *See Porter v.*

*State,* 289 Md. 349, 424 A.2d 371 (1981); *Taylor v. State,* 352 Md. 338, 345–46, 722 A.2d 65 (1998). Further, this right is substantive and absolute. *Stewart v. State,* 334 Md. 213, 225, 638 A.2d 754 (1994).

The record is devoid of any reference to the note at issue labeled as "Court's Exhibit # 4." As appellants assert, neither the transcripts nor record reveal any communication with the jury about the note. Furthermore, neither Fields nor Colkley have any recollection of the note nor did prosecutor Gerard B. Volatile. The trial judge indicated that he did not remember the note, but opined that he would have instructed the jury to "decide the case on the evidence" and "[t]here is no chance [the court] would have simply ignored the note if [it] knew about it." The trial judge suspected "that it may have been dealt with in the midst of other cases and that portion of the proceeding was not transcribed."

The Court of Appeals, in *Denicolis v. State,* 378 Md. 646, 657–59, 837 A.2d 944 (2003), considered a claim similar to that asserted in the case *sub judice.* A note received by the court in *Denicolis* was marked as an exhibit, but the record revealed no mention of or response to it. *Denicolis,* 378 Md. at 653, 837 A.2d 944. It was "not time-stamped, and apparently counsel were unaware of it until after the verdict had been taken. . . ." *Id.*

■ Because, in the case at bar, it is "not so clear cut" whether the trial judge informed the parties of the note, the State argues that "[t]he failure to recall does not necessarily mean that the note was not properly handled by the trial court." An appellant has the burden of producing a record to rebut the general presumption that a trial court's actions are correct. *Denicolis,* 378 Md. at 657, 837 A.2d 944 (citing *Mora v. State,* 355 Md. 639, 650, 735 A.2d 1122 (1999)). In the instant case, the State argues that the affidavit from the trial judge is the record that appellants must prove defective and absent an affirmative statement that the note was not discussed, we should hold that there was compliance with Rule 4–326.

Maryland Rule 4–326(d), in setting the parameters for communications with the jury, provides:

[t]he court shall notify the defendant and the State's Attorney of the receipt of any communication from the jury pertaining to the action as promptly as practicable and in any event before responding to the communication. All such communications between the court and the jury shall be on the record in open court or shall be in writing and filed in the action. The clerk or the court shall note on a written communication the date and time it was received from the jury.

Thus, the trial court must notify the parties of any communication before responding to it. *Denicolis,* 378 Md. at 657, 837 A.2d 944.

The notes received in *Denicolis* came after the jury retired to deliberate. *Id.* at 653, 837 A.2d 944. The note at issue in *Denicolis* asked for a definition of solicitation and the record reflected no response or any mention of the note. *Id.*

The State contends that the note at issue was not a request, as in *Denicolis,* for a legal definition, but rather for clarification of the evidence, which in any event would have been handled by the trial judge with an admonition to the jury to decide the case based on the evidence before it. There is no possibility of a prejudicial answer and thus, it posits, there can be no "non-harmless" error before this Court.

The Court in *Denicolis* held that the failure to inform appellant or his attorney about the note received by the trial court constituted error. *Id.* at 658, 837 A.2d 944. Seizing upon the court's affirmation that "there is no chance we would have simply ignored the note if we knew about it" and "it may have been dealt with in the midst of other cases," the State maintains that "a trial court's actions and decisions are generally presumed to be correct" and it is appellants' burden "to produce a record sufficient to show otherwise." *Denicolis,* 378 Md. at 657, 837 A.2d 944, citing *Mora v. State,* 355 Md. 639, 650, 735 A.2d 1122 (1999). The State's argument is circular. The very circumstances extant, *i.e.,* the fact that there was no

proceeding, at which appellants could have developed a trial record, absolves appellants of any responsibility or burden to produce a record. At most, the State's only argument would be that the content of the note did not relate to the jury's deliberations. Under the circumstances, any burden to show that the failure to properly respond to the jury communication pursuant to the dictates of Maryland Rule 4–326 was harmless rests squarely on the State. The record must affirmatively show that the failure to respond to the communication was not prejudicial. *Id.* at 659, 837 A.2d 944 (citing *Noble v. State,* 293 Md. 549, 563, 446 A.2d 844 (1982)).

In the usual fact pattern, the complaint is that the record reflects that a trial judge has received and responded to a communication from the jury in the absence of the accused and/or his attorney. In such case, the asserted violations are that a defendant has been denied the right to be present at a critical stage of the proceedings and, therefore, unable to object to an allegedly inappropriate response by the court or offer a response that the defendant contends to be appropriate and argued to be—in some instances—a more direct response to the question posed by the jury than that proposed by the trial judge or prosecutor.

The unclear and inexplicable circumstances surrounding the pedigree and disposition of State's Exhibit # 4 present different potential deprivations of appellants' rights. We cannot know whether appellants were denied the right to be present at a time—clearly a critical stage of the proceedings—that the court considered and responded to the jury note. We are further not aided by the affidavits submitted by counsel indicating that they have no recollection of the existence of— or response to—the note, or by the court's affidavit indicating that it would have routinely advised the jury that it should rely on its recollection of the evidence and that the disposition of the note may have been transcribed during another court proceeding. Moreover, we are not persuaded by the State's attempt to distinguish *Denicolis* on the basis that, in that decision, the court was confronted with a request for clarification of a legal issue—the definition of solicitation—as opposed

to a factual issue, as here, where the jury wanted clarification of the testimony of the firearms expert as such testimony was probative as to who and how many gunman fired shots killing Bowens and wounding Hollie and Courts.

Regarding the fact that the note made inquiry about a factual matter, because the note was not date stamped or time stamped, the possibility exists that the note was submitted before the jury retired to begin its deliberations. If submitted *before* the defense rested its case, appellants could have tailored their presentation to address the jury's concerns and, at any time before the conclusion of all of the evidence, they could have moved to reopen their case. Assuming the note was submitted *after* the jury retired to deliberate, because of the centrality to criminal agency of the question posed, the error in the failure to afford appellants an opportunity to offer input cannot be harmless. Aside from the fact that the response, if any, is not reflected in the record and thus is unknown, appellants could have offered proposed responses, including, but not limited to, requesting that the trial judge order the court reporter re-read the testimony of the expert witness.

We hold that the failure to afford appellants the opportunity to be present when or if the court disposed of the note in the case at hand constituted error under *Denicolis*. But, in this case, where we cannot know whether the court acted at what would have undisputedly been a "critical stage," the mere failure of the jury to receive a response to its communication denied appellants' rights. Stated otherwise, even if *Denicolis* were arguably not implicated, an equally significant right is denied.

Although we do not know what action was taken in response to the jury's note, what we do know is that the note was submitted and marked as an exhibit in the proceedings and what we must surmise is that there is a real possibility, if not probability, that the jury never received an answer to a substantive question it deemed important to its determination of who murdered Bowens and wounded Hollie and Courts.

Sixty years ago, the Supreme Court of the United States, in *Bollenbach v. U.S.*, 326 U.S. 607, 612–13, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946), explained:

> The jury was obviously in doubt as to Bollenbach's participation in the theft of the securities in Minneapolis and their transportation to New York. The jury's questions, and particularly the last written inquiry in reply to which the untenable 'presumption' was given, clearly indicated that the jurors were confused concerning the relation of knowingly disposing of stolen securities after their interstate journey had ended to the charge of conspiring to transport such securities. *Discharge of the jury's responsibility for drawing appropriate conclusions from the testimony depended on discharge of the judge's responsibility to give the jury the required guidance by a lucid statement of the relevant legal criteria. When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy.*

(Emphasis added).

Thus, we are not required, on this appeal, to determine whether the actions of the trial judge in responding to a jury communication constituted error or harmless error because we simply do not know what the response, if any, was. We hold that, because the burden is on the State to demonstrate that any error was harmless, the failure to afford appellants an opportunity to participate in determining the proper response constitutes reversible error. We shall therefore reverse and remand for further proceedings.

## II

### A

Appellant Colkley contends that he was tried in violation of the statutory right to a speedy trial under Maryland Rule 4–271 and Maryland Code Annotated, Criminal Procedure Article § 6–103.[2] Colkley grounds the contention on the fact that

---

2. Unless otherwise indicated the Court shall refer to Md.Code Ann., Criminal Procedure (2001 Repl. Vol. 2006 Supp.).

over one year and eight months passed between his arrest and trial. "During that time, his case was postponed at least five times, always over his objection, for reasons including the unavailability of the court, the State's Attorney, and the State's witnesses." Colkley assigns error to the trial court's denial of his motion to dismiss because the postponements were unreasonable. We disagree.

The timeline from appellants' arrests and first appearance of counsel and the trial of Fields and Colkley is as follows:

July 9, 2003 Colkley and Fields arrested

Aug. 4, 2003 Indictments filed.

Oct. 7, 2003 Defendants arraigned; counsel enter appearances.

Oct. 14, 2003 Colkley files motion for speedy trial.

Dec. 18, 2003 Prosecutor, Carrie Bauer, enters appearance on behalf of the State.

Feb. 4, 2004 First trial date; postponement requested by counsel for Fields; postponement by the State in case against Colkley; administrative court finds good cause to postpone beyond 180–days.

Feb. 13, 2004 Motion to Dismiss filed by Colkley.

April 5, 2004 180–day (*Hicks*) deadline.

May 10, 2004 Second trial date; postponement due to court unavailability; all parties indicate readiness for trial; administrative court finds good cause.

June 17, 2004 Prosecutor, Gerald Volatile, enters appearance on behalf of the State.

Oct. 19, 2004 Fourth trial date; postponement requested by the State because prosecutor unavailable due to another trial as well as unavailability of the trial court; administrative court finds good cause; case rescheduled for January 12, 2005.

Jan. 5, 2005 State requested postponement due to heavy workload relating to a new position he was given within the State's Attorney's Office and the complicated circumstances of the cases against Colkley and Fields, including the immunity requests for the State's witnesses; administrative court finds good cause and, taking into consider-

ation the schedules of all parties, sets trial date for March 22, 2005, "the nearest in time we could find good cause to get it in."

March 22, 2005 Motions to Dismiss, *in limine,* argued.

March 24, 2005 Motion to Dismiss denied; jury sworn

In Maryland, the scheduling of a Criminal proceeding is governed by Section 6–103 [3] of the Criminal Procedure Article. Section 6–103 reads:

(a) Requirements for setting date.—(1)  The date for trial of a criminal matter in the circuit court shall be set within 30 days after the earlier of:

(i)  the appearance of counsel;  or

(ii)  the first appearance of the defendant before the circuit court, as provided in the Maryland Rules.

(2) The trial date may not be later than 180 days after the earlier of those events.

(b)  Change of date.—(1)  For good cause shown, the county administrative judge or a designee of the judge may grant a change of the trial date in a circuit court:

(i)  on motion of a party;  or

(ii)  on the initiative of the circuit court.

(2) If a circuit court trial date is changed under paragraph (1) of this subsection, any subsequent changes of the trial date may only be made by the county administrative judge or that judge's designee for good cause shown.

(c)  Court rules.—The Court of Appeals may adopt additional rules to carry out this section.

Md.Code Ann., Criminal Procedure § 6–103.  Complementing Section 6–103 is Maryland Rule 4–271,[4] which states, in pertinent part:

(a) Trial Date in Circuit Court. (1) The date for trial in the circuit court shall be set within 30 days after the earlier of the appearance of counsel or the first appearance of the

---

**3.**  Section 6–103, which became effective October 1, 2001, was derived without substantive change from Section 591 of Article 27.

**4.**  Maryland Rule 746 provided:

defendant before the circuit court pursuant to Rule 4–213, and shall be not later than 180 days after the earlier of those events. When a case has been transferred from the District Court because of a demand for jury trial, and an appearance of counsel entered in the District Court was automatically entered in the circuit court pursuant to Rule 4–214(a), the date of the appearance of counsel for purposes of this Rule is the date the case was docketed in the circuit court. On motion of a party, or on the court's initiative, and for good cause shown, the county administrative judge or that judge's designee may grant a change of a circuit court trial date. If a circuit court trial date is changed, any subsequent changes of the trial date may be made only by the county administrative judge or that judge's designee for good cause shown.

The Court of Appeals, in *State v. Hicks,* 285 Md. 310, 318, 403 A.2d 356 (1979), held that the speedy trial requirement of Rule 746 was mandatory and, absent extraordinary cause, "dismissal of the criminal charges is the appropriate sanction." The Court held that the provisions of then Rule 746 were of mandatory application for the prosecution and defense alike and that the rules were not "mere guides or benchmarks to be observed, if convenient." *Id.*

■ Thus, the sanction of dismissal may be ordered when a trial date does not comply with the prescribed statutory 180 day period in Maryland Rule 4–271 and Criminal Procedure Article § 6–103. *See Dorsey v. State,* 349 Md. 688, 709 A.2d 1244 (1998); *Hicks, supra.* "The sanction of dismissal, where that sanction is applicable, is not for the purpose of protecting

---

a. General Provision.
Within 30 days after the earlier of the appearance of counsel or the first appearance of the defendant before the court pursuant to Rule 723, a trial date shall be set which shall be not later than 180 days after the appearance or waiver of counsel or after the appearance of defendant before the court pursuant to Rule 723.
b. Change of Trial Date.
Upon motion of a party made in writing or in open court and for good cause shown, the county administrative judge or a judge designated by him may grant a change of trial date.

a criminal defendant's right to a speedy trial; instead, it is a prophylactic measure to further society's interest in trying criminal cases within 180 days." *State v. Brown,* 307 Md. 651, 658, 516 A.2d 965 (1986) (citing *Farinholt v. State,* 299 Md. 32, 41, 472 A.2d 452 (1984)). The goal of the dismissal sanction is to foster prompt disposal of criminal matters at the circuit court level. *State v. Brown,* 355 Md. 89, 108, 733 A.2d 1044 (1999).

A determination by the administrative judge to extend the trial date beyond 180 days is given "wide discretion" and carries a "heavy presumption of validity." *See Tapscott v. State,* 106 Md.App. 109, 122, 664 A.2d 42 (1995), *aff'd,* 343 Md. 650, 684 A.2d 439 (1996); *Dalton v. State,* 87 Md.App. 673, 682, 591 A.2d 531, *cert. denied,* 325 Md. 16, 599 A.2d 89 (1991); *State v. Green,* 54 Md.App. 260, 266, 458 A.2d 487 (1983), *aff'd,* 299 Md. 72, 472 A.2d 472 (1984). If it is the administrative judge who extends the trial date and the order is supported by necessary cause, the postponement is valid and both the requirements and purposes of the statute and rule have been fulfilled. *See State v. Parker,* 347 Md. 533, 539, 702 A.2d 217 (1995) (quoting *Rosenbach v. State,* 314 Md. 473, 479, 551 A.2d 460 (1989); *State v. Cook,* 322 Md. 93, 97, 585 A.2d 833 (1991); *Goins v. State,* 293 Md. 97, 111–12 (1982)). A trial judge entertaining a motion to dismiss must accord the administrative judge deference. *Parker,* 347 Md. at 538, 702 A.2d 217 (quoting *State v. Frazier,* 298 Md. 422, 451–54, 470 A.2d 1269 (1984)).

Moreover, the discretionary decision of the administrative judge as to whether good cause existed is rarely subject to reversal on review. *Frazier,* 298 Md. at 451–54, 470 A.2d 1269. "The burden of demonstrating a clear abuse of discretion is on the party challenging the discretionary ruling on the postponement." *Brown,* 355 Md. at 98, 733 A.2d 1044, *accord State v. Toney,* 315 Md. 122, 138, 553 A.2d 696 (1989). Thus, a defendant seeking dismissal on *Hicks* grounds bears "the burden of demonstrating either a clear abuse of discretion or a lack of good cause as a matter of law." *Brown,* 355 Md. at 108, 733 A.2d 1044.

■ In the instant case, Colkley disputes the length of delay between the first postponement and the next scheduled trial date of May 10, 2004. The postponement was due to the illness of the attorney for Colkley's co-defendant Fields. The prosecutor stated that there was a disappearance of a witness in Colkley's other criminal case and that she had another case beginning the Monday of the week following, the time Fields' attorney expected to recuperate. The trial court properly sent the case to the administrative judge.

The administrative judge heard from the State that it could not guarantee that the witness would be located by Monday of the following week nor could the defense guarantee that Fields' attorney would have recuperated from the flu. The administrative judge found good cause. We perceive no abuse of discretion or lack of good cause as a matter of law.

## B

The second contention raised by both appellants is that they were denied their constitutional right to a speedy trial under the Sixth Amendment of the United States Constitution, Article 21 of the Maryland Declaration of Rights and the dictates of the Supreme Court decision in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). In *Barker*, the Court provided a balancing test that "necessarily compels courts to approach speedy trial cases on an *ad hoc* basis." *Id.* at 530, 92 S.Ct. 2182. The factors outlined by the Court include "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* (footnote omitted).

The Court of Appeals reiterated the well-settled standard of review when considering a motion to dismiss based on the alleged denial of the right to a speedy trial in *Glover v. State*, 368 Md. 211, 220–21, 792 A.2d 1160 (2002):

> In reviewing the judgment on a motion to dismiss for violation of the constitutional right to a speedy trial, we make our own independent constitutional analysis. *See State v. Bailey*, 319 Md. 392, 415, 572 A.2d 544, 554–55, *cert.*

*denied,* 498 U.S. 841, 111 S.Ct. 118, 112 L.Ed.2d 87 (1990); *see also Crosby v. State,* 366 Md. 518, 526, 784 A.2d 1102, 1106 (2001) (stating that "when the issue is whether a constitutional right has been infringed, we make our own independent constitutional appraisal"); *Jones v. State,* 343 Md. 448, 457, 682 A.2d 248, 253 (1996); *Carroll v. State,* 335 Md. 723, 736, 646 A.2d 376, 383 (1994). We perform a *de novo* constitutional appraisal in light of the particular facts of the case at hand; in so doing, we accept a lower court's findings of fact unless clearly erroneous. *See Rowe v. State,* 363 Md. 424, 432, 769 A.2d 879, 883 (2001) (conducting a *de novo* review of a trial court's legal/constitutional conclusions with respect to a denial of a motion to suppress under the Fourth Amendment, but stating that a trial court's findings of fact are reviewed under a clearly erroneous standard); *Cartnail v. State,* 359 Md. 272, 282, 753 A.2d 519, 525 (2000) (maintaining that this Court does not engage in *de novo* fact-finding); *State v. Ruben,* 127 Md.App. 430, 438, 732 A.2d 1004, 1008, *cert. denied,* 356 Md. 496, 740 A.2d 613 (1999).

In weighing the relevant factors, the Supreme Court observed:

We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process. But, because we are dealing with a fundamental right of the accused, this process must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution.

*Barker,* 407 U.S. at 533, 92 S.Ct. 2182 (footnote omitted).

### LENGTH OF THE DELAY

The State and appellants agree that the length of the delay was over twenty months (July 9, 2003 to March 24,

2005).    In assessing the length of the delay, *Barker* teaches us:

> The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.   Nevertheless, because of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case.   To take but one example, the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge.

*Barker,* 407 U.S. at 530–31, 92 S.Ct. 2182 (footnote omitted).

Considering the length of the delay, the trial court observed that the twenty-month delay discussed *infra* was prejudicial and, thus, triggers the balancing of the factors.

The Court in *Epps v. State,* 276 Md. 96, 111, 345 A.2d 62 (1975), held a delay of one year and fourteen days as "presumptively prejudicial." *Jones v. State,* 279 Md. 1, 6, 367 A.2d 1 (1976).    Thus, in the case *sub judice,* the twenty month delay is presumptively prejudicial and, thus, we turn to an analysis of the remaining factors.

### REASON FOR THE DELAY

In establishing benchmarks for weighing the reason for the delay, the *Barker* Court said:

> Closely related to length of delay is the reason the government assigns to justify the delay.   Here, too, different weights should be assigned to different reasons.   A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government.

> A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather

than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Barker,* 407 U.S. at 531, 92 S.Ct. 2182 (footnote omitted).

Appellants assert that the twenty-month delay between the date of their arrest and trial was overwhelmingly attributable to the State because of an unexplained lengthy delay between their arrest and the first trial date, courtroom unavailability and prosecutorial unpreparedness. We address the relevant dates.

### Delay between Arrest and First Trial Date

Appellants contend that the seven month delay from the time of their arrest on July 9, 2003, to the first trial date on February 4, 2004, should be weighed against the State because neither Fields nor Colkley had any control over the time within which the trial was initially set and no reason has been given by the State for the delay.

There is no precise formula for computing an unconstitutional delay. *Dorsey v. State,* 34 Md.App. 525, 533, 368 A.2d 1036 (1977). In *Dorsey,* we opined that an almost eleven month delay for a relatively uncomplicated drug case triggered an inquiry into the factors enunciated in *Barker. Id.*

The trial court found that the complexity of the case, including witness availability, contributed to the delay. Accepting the court's conclusion as to the reason for this delay, we accord it less weight, but charge it against the State because "the ultimate responsibility for such circumstances rests with the government." *Id.*

### First Trial Date—Wednesday, February 4, 2004

Fields' defense counsel did not appear due to a reported illness at the first scheduled trial date. Consequently, substitute counsel requested a brief postponement on Fields' behalf and explained that Fields' counsel would be available "at the latest the beginning of next week." The trial judge suggested to the Administrative Court that "the case be

placed on either the move list, movable until Monday, or a short postponement."

The prosecutor argued to the administrative judge against placing the matter on the move list, noting that the "lead detective is going to be out of the country the last [two] weeks here in February and the first week in March," and that there were also "5th [A]mendment privilege" issues raised by the witnesses that she needed to address in regard to witnesses. The Court granted the postponement generally upon a finding of "good cause" and trial was subsequently scheduled for May 10, 2004.

Fields contends that the time between the first scheduled day of trial and the following Monday is attributable to him, but argues that the remainder of the time between the first and second trial date should not be so attributed as the delay he requested was only until the "beginning of next week." Further, Fields and Colkley agreed with the judge that the case should be put on the "move list," but according to appellants, the prosecutor was against the idea for the reasons stated *supra.*

Thus, appellants argue that Fields' counsel was responsible for the five day delay while the State is essentially responsible for the length of the delay afterward because the State was seeking to have the matter postponed a much longer time than necessary. The State, in Fields' view, "was essentially seeking to 'capitalize' " on Fields' counsel's illness in order to secure a needed postponement that would be attributed to appellant. Colkley argues that the State was not available until the beginning of the following week and wanted appellants' cases to remain consolidated.

Analyzing the State's reasons reveals that if the matter had been started on Monday, the detective had five days prior to his departure to testify and the 5th Amendment privilege issues claimed by the State as to several of its witnesses prevented any February 4th start regardless. Thus, Fields argues that five days are attributable to Fields and the balance of three months to the State.

Although the five days are attributable to Fields and the additional three-month delay to the State, we do not find it unreasonable. The trial judge reviewed the transcript and made a factual finding that reasonable circumstances existed between the illness of appellant's counsel, court backlog and unavailability of witnesses. The trial court weighed the postponement against the government, but not heavily. *Dorsey,* 34 Md.App. at 533, 368 A.2d 1036. We accord the delay neutral status. *Howell v. State,* 87 Md.App. 57, 82, 589 A.2d 90, *cert. denied,* 324 Md. 324, 597 A.2d 421 (1991) (stating that the time between arrest and the first trial date is usually accorded neutral status). We accept the trial court's assessment as to this delay.

## Second Trial Date—May 10, 2004

■ The parties appeared and indicated that they were all ready to proceed, but as there was no "court available," the case was transferred to the administrative judge. The prosecutor informed the judge that this case would take about a week and a half, and the other case in which Colkley was the lone defendant would take approximately one week. The judge was told by the prosecutor that she had a " 'much older case' scheduled to begin the 24th" and, thus, could only send one case to a courtroom at that point. During the ensuing discussion, Fields' counsel advised the court of a potential issue regarding his availability because his daughter was scheduled to have surgery in New Hampshire. Fields' counsel did not request a postponement. The administrative judge elected not to hold the case for a courtroom to become available and, instead, set a new trial date of July 28, 2004.

Thus, the nearly three month delay as a result of having no courtroom available is attributable to the State. *Barker, supra.* Appellant asserts that we have opined "[w]hile the State will be held accountable for this fact, it will not weigh heavily against the State." As such, while not as egregious as other postponements in this matter, "the ultimate responsibility for such circumstances must rest with the government

rather than the defendant." *Barker,* 407 U.S. at 531, 92 S.Ct. 2182.

The trial judge addressed the delay as follows:

Just like the May 10th one, there were issues, personal issues, relating to [appellant's counsel's] health in the first one and his daughter's health in the second one that seemed to be significant events in the decision to postpone the case. So they were probably a mixed bag as to whose fault they were.

The case was also complicated by the fact that your client, Mr.—

[Colkley's Counsel]: Colkley.

THE COURT:—Colkley had another case in the system which eventually disappeared. But it seemed to affect the approach which was taken to dealing with the cases. It's also frankly true, having sat here for the last couple days watching this, that the case is affected severely by the cast of characters involved in the case, the witnesses, the fact that the witnesses fairly, clearly, as is almost always the case, are being pushed and pulled in different directions, which affects their anxiousness to actually appear, testify and get this case resolved, which also tends to make it difficult, it adds to the complexity of a case, frankly, the fact that that's going on with the witnesses, one of the witnesses having subsequently been murdered. So he's not here at all.

No evidence in the record suggests that the State was unable to commence the trial, but contrary to appellants' contention, neither was there evidence that the State purposely delayed trial. After reviewing the tape of the proceedings the trial court stated that "my impression of what happened that day was, that it did come in as a no court available. That was the official reason." Although the record does not reflect that there was a purposeful delay by the State, it nevertheless must be weighed against the State.

### Third Trial Date—July 28, 2004

On July 28, 2004, the following transpired:

THE COURT: Twice before? For the same reason?

[PROSECUTOR]:[5] For various reasons. It was transferred to me when an attorney in my unit was transferred to another unit. I've had the case for approximately a month, I've been able to work on it for approximately two weeks. In the process I've discovered that a witness that I think should have been summonsed wasn't summonsed. That witness [sic] actually ran into he did not get his summons. of course it was only issued a week ago. He didn't get his summons, wasn't available today. But the most important problem in my opinion for me, is that the Homicide detective sergeant, who is a necessary witness in both cases, is leaving the country actually, either tonight or tomorrow, definitely by tomorrow, for vacation, he won't be back until Monday. And essentially Your Honor, essentially I am not prepared to try these cases because I haven't had enough time to review them. But I do know that some of my necessary witnesses are definitely not available.

THE COURT: Today.

[PROSECUTOR]: Today or any time this week, or until sometime early next week.

THE COURT: Do we have any dates after next week?

[PROSECUTOR]: Madam Clerk said that there were earlier dates, but each Defense attorney had problems.

THE COURT: So you already know about that.

CLERK: Right, I do (inaudible).

THE COURT: And I can't get it in any earlier. It's either don't postpone it all, or set it in for the earliest date I can get it in.

CLERK: (Inaudible).

THE COURT: I'm sorry, say it again.

---

5. Mistakenly identified as appellant's counsel in the transcript.

CLERK: They couldn't agree on the dates.

THE COURT: All of these guys are busy, all three of them.

[COLKLEY'S COUNSEL]: In actuality Your Honor, I think one of the dates was August 27. Now, I recognize that my client has two cases against him, one of which has a co-defendant—he is a co-defendant with Mr. Fields, the other he is by himself. 27, I think I was available. I may be wrong on these dates. I think it's the State that was unavailable.

[COLKLEY'S COUNSEL]:[6] No, I'm available Judge for the 27.

[PROSECUTOR]: I'm already scheduled for trial that day in another—

[COLKLEY'S COUNSEL]: I'm sorry, the State was unavailable that date.

THE COURT: All right. It's your case now.

[PROSECUTOR]: Thank you, yes sir.

THE COURT: I'm going to give you a date. If you're not ready on that date don't—well, I might be the administrative judge. It ought not be postponed again.

[PROSECUTOR]: *I will be ready on that date Your Honor.*

■ All parties appeared before the trial court and the assigned State's Attorney indicated to the court that he had just received this case and had been "working the case for about two weeks" although he had "the file for about four weeks...." In regard to witness unavailability, he explained that "the primary detective, or the sergeant in this case is a necessary witness in both cases," and that the officer will be going "on vacation either tonight or tomorrow. I know as of tomorrow, he is out of the country on vacation and won't be back until Monday night. That's the big one." The prosecutor explained that "there are immunity issues that I need to address with the deputies in our office, that I started addressing yesterday but didn't conclude. There's another witness

---

6. Because of confusion in the transcription, it appears Fields' counsel has been identified as Colkley's attorney.

who the prior attorney was not going to summons who I issued a summons for last week" and concluded that "a myriad of issues," existed but that essentially witnesses were unavailable for the State to proceed that day. Colkley's counsel reiterated that he and appellant were opposed to postponements, and had "continually refused to waive *Hicks,*" and the matter was again referred to the Administrative Court.

The administrative judge then heard the prosecutor's request for postponement and initially acknowledged that "[t]hese cases are very old." Colkley' s counsel argued that "[t]he State says that it is not prepared to go to trial today. My client's been in jail now for one year and two weeks. *Hicks* has run, it's never been waived. We're on constitutional speedy trial issues."

The administrative judge admonished the prosecutor and allowed a delay with the stipulation that the State must be ready for trial and "[i]t ought not be postponed again." The prosecutor answered that the State would be ready and the judge, over the objections of appellants, granted a postponement because the State was unprepared and rescheduled the trial for October 19, 2004.

Appellants assert that this delay is entirely attributable to the State and regards it as "stunning that nearly [thirteen] months after [appellant] was arrested, the State was still unprepared for trial given the stated reasons for being unprepared" and that "none of the reasons offered by the Assistant State's Attorney for the requested postponement withstand scrutiny." Appellants posit that, even accepting the prosecutor's proffer that he had a month to review the case, summons witnesses, and prepare for trial, he had actually appeared before the court in relation to this case over two months prior. Standing in for another prosecutor, he had informed the court at that time that Lee had failed to appear for a May 10, 2004 trial date and had consequently been arrested and brought before the court. Lee was thereafter released, having received a summons to appear in the future along with instructions as to contacting the State. Thus,

according to appellants, the Assistant State's Attorney was not completely unfamiliar with this case as his testimony implies. Further, it was inexcusable for the State to allow a law enforcement witness to schedule vacation.

Additionally, the State was unprepared to move forward on May 10th because Lee was not available and he was the only witness to implicate Fields and Colkley in the shooting. Appellants assert that the State has attempted to "camouflage the reason for the postponement" by asserting that, even if there were reasons beyond courtroom unavailability, the form only allowed one reason to be marked.

According to Fields, the prosecutor did not pursue his case with any real professional diligence despite his repeated requests for a speedy trial. He asserts that the State was able to resolve its immunity issues within one day when the proceedings would not go forward unless it did so and the immunity of witnesses was raised over five months before the scheduled February trial date. The prosecutor had two and a half months to ensure the detective's availability to show up for the trial date, insists Fields, and, thus, the delay occasioned by Massey's vacation should weighed heavily against the State. Moreover, the detective would have returned by the time preliminary motions were argued and other witnesses could have been called first, leaving ample time to begin the case. Finally, the detective was actually not called until the sixth day of trial, demonstrating that his unavailability was not a legitimate reason for the delay. We discern merit in Fields' protestations.

This delay is weighed heavily against the State.

### Fourth and Fifth Trial Dates— October 19, 2004; January 5, 2005

When the prosecutor proffered that "the State is not prepared because [the prosecutor was] in trial" and Colkley's and Fields' counsel indicated that they were prepared to go forward, the matter was again referred to the administrative judge. Colkley's attorney, standing in for Fields' attorney,

argued against a further postponement and the court addressed the prosecutor standing in for the prosecutor assigned the case. The following exchange occurred:

THE COURT: I'm not asking about today, I'm asking about generally speaking. *If we put this in, is [the prosecutor] going to try the damn case or are we going to have more of this nonsense?*

THE STATE: What he said to me is, he is stacked to start the same defendants he's in trial now right behind—

THE COURT: I got that part.

THE STATE: —that one.

THE COURT: That's fine.

THE STATE: What he said to me is as long as the Admin [sic] Court doesn't send him to trial, he'll reserve this date for this case.

THE COURT: I tell you, I have certain other motivations which are unrelated to this. But the reason I'm a little uncomfortable is, I've a whole lot of really screwed up cases in Part 21. I mean, she has a whole lot of really screwed up cases. And I'm just feeling a little uncomfortable about dumping this on top of her because I know what I've put in there and there's all sorts of screwed up stuff in there. So I'd really not put this in 21 because I'm tired of giving her all of the screwed up cases, to be brutally frank. You're going to have to tell Jerry that if we put it in there he' s got to do it and no more-I know he's not trying to screw this up, I know he's trying to try the case. But I just can't have this keep happening.

CLERK: He's contacting Judge Themelis.

THE COURT: Let him have this disaster on the same date, January. He can move this case January 12 come hell or high water.

THE STATE: (Inaudible) this takes priority. So that's what I'll tell him.

THE COURT: What's wrong David?

CLERK: Can I get your autograph?

**534**

THE COURT: What is this?

CLERK: This is the monthly report.

THE COURT: Oh, I know, I forgot. I got an email complaining about the fact that we hadn't filed this stupid bureaucratic document.

CLERK: I apologize.

THE COURT: Do you believe this? Some people have these reserve lists that are just endless. I reserve nothing if I can avoid it.

THE STATE: I don't blame you.

THE COURT: Because if you reserve cases you never get to them, like this. So are you guys guilty otherwise?

COLKLEY'S COUNSEL: Let's put it this way Judge, they're no guiltier than the witnesses.

THE STATE: It's Baltimore City, huh.

THE COURT: In other words, everybody at the gunfight at the O.K. Corral extended.

COLKLEY'S COUNSEL: Apparently it just continued to escalate from January of 2003 to this issue took place in May of 2003. It's an old, old case. The witnesses that the State had who were locked up have since been released. That's how long it is. And that's part of—I saw the witnesses, I've taken—

THE STATE: And Jerry says he's waiting for the affidavits.

COLKLEY'S COUNSEL: I have them here, no.

THE COURT: Why don't we stand down so I can call some of these other cases. We're trying to do something with this, just hang on.

(Bench Conference concluded—11:57:12)

(Off the record—11:57:11)

(Session resumes 12:06:03)

THE COURT: Here's the story. On Fields and Colkley, after going through all of that, I talked to the judge. He'll try the case, he'll get it tried on January 12 and that will be the end of it. Part 24, January 12. You have to

tell Mr. Volatile he's got to be there, he's got to be ready. Okay?

COLKLEY'S COUNSEL: And again Your Honor, so it is clear, by agreeing—

THE COURT: I know.

COLKLEY'S COUNSEL: —to the January 12 thing we're not agreeing to the postponement.

THE COURT: You're not agreeing to the postponement, I know. Thank you.

(Emphasis added).

The trial judge, over the objections of Colkley and Fields, again postponed the matter until January 12, 2005, with an admonition to the prosecutor standing in for the Assistant State's Attorney that "[y]ou have to tell [Assistant State's Attorney] he's got to be there, he's got to be ready to go."

On March 24, 2005, the following transpired:

THE COURT: Okay. Let's deal with a few things before we get Mr. Waddell here. Now, I, I thought about, I checked out the tapes. We'd previously checked out the tape in the July date which was the Part 25 tape actually over there. I, there's a Part 25 tape of May 10th. I will tell ya what my impression of what happened that day was, that it did come in as a no court available. That was the official reason.

Now, I think [Colkley's counsel] indicated that later, that was the one where later the State's Attorney asked for a body attachment. But the way the record appears, they actually, that was the official position. It was no court available. They were ready for trial. Which leads me to the conclusion that they were gonna try the case without the witness or do something, God knows what.

The judge starts tryin[g] to figure out if he can find a place to put the case and at one point it, it reached the point where it seemed to me, there was discussion about holding it for a few days or something. There was an issue raised by [Fields' counsel] about his daughter having surgery or something of that nature and that appears to have been, at

least it looked to me like, it's hard to tell what's in some-body's mind when you're watching a tape of a proceeding you didn't preside over and even when you did preside over it you don't always know what you were thinking.

FIELDS' COUNSEL: What day was that, Judge?

THE COURT: That was the, the 10th of May. There was an issue about [Fields' counsel's] daughter having a surgery of some kind and that appears to have triggered the judge to give up tryin[g] to get it in. So like with a lot of these postponements there were a mixture of factors, the, from both sides. The 10/19 date, it appeared it was entirely a matter of Mr. Volatile, largely a matter of Mr. Volatile being in trial in Part 21. I mean I don't know if Mr. Volatile remembers this but that's what's mentioned on the record, which is obviously, I guess, reasonable cause frank-ly.

The, actually I was surprised. I read over some cases, *Glover v. State,* 368 Md. 211, 792 A.2d 1160 (2002). At the risk of looking like other judges I'm not gonna [sic] read the entire case to you. But I had thought, there's a, it was a Howard County case which was a drunk driving case which they discussed a 14–month postponement. That's not this case. But it took 14 months to ever get the case in, and that got dismissed and they sort of seemed to suggest, I thought in that decision, that this kind of delay was purely chargeable to the State.

In the *Glover v. State* case, which was a Court of Appeals case, they say that no court available is a neutral reason. Somehow I'd gotten the impression from the Howard County case which went to, I don't know if [it] was a Court of Special Appeals or Court of Appeals decision, that no court available was chargeable to the State. The decision clearly says it's a neutral reason, that it's not chargeable to any-body.

I will tell ya [sic] frankly having looked at, watched this proceeding as it's unfolded, having watched the whole situation unfold, there appear to be valid reasons for all the postponements. The case is not, I do think the case rises to

the level of requiring a balancing. I mean clearly [seventeen] months is a long time and they've been in jail for what, [twenty] months?

COLKLEY'S COUNSEL: Twenty months, Your Honor.

THE COURT: Twenty months. I think there, just by the very nature of that type of delay there's some prejudice to the defendants. The postponements appear to be, from my evaluation of the record, all reasonable. Some are chargeable to the system, that's ourselves. Some are chargeable to the State. Some are chargeable, some seem to be implicated with problems both by defense counsel and the State like the two I discussed, one which was the one that we discussed earlier that was the one that passed the 180 days on *Hicks*.

Just like the May 10th one, there were issues, personal issues relating to Mr. Denholm's health in the first one and his daughter's health in the second one that seemed to be significant events in the decision to postpone the case. So they were probably a mixed bag as to whose fault they were.

The case was also complicated by the fact that your client, Mr. – –

COLKLEY'S COUNSEL: Colkley.

THE COURT: – –Colkley had another case in the system which eventually disappeared. But it seemed to affect the approach which was taken to dealing with the cases. It's also frankly true, having sat here for the last couple days watching this, that the case is affected severely by the cast of characters involved in the case, the witnesses, the fact that the witnesses fairly, clearly, as is almost always the case, are being pushed and pulled in different directions, which affects their anxiousness to actually appear, testify and get this case resolved, which also tends to make it difficult, it adds to the complexity of a case, frankly, the fact that that's going on with the witnesses, one of the witnesses having subsequently been murdered. So he's not here at all.

Having thought about all this and gone over all the various postponements which we've really discussed *ad nauseam*, I think the postponements were reasonable under all the circumstances. I think there, as the case that I mentioned, *Glover v. State*, goes on and on about how there's no test, it's a slippery slope, who really knows, and that's true.

But having looked at the problems faced by the State, by the defense and the nature and purpose of the various postponements, I can't, I believe it was, the postponements, while more than one would like and sufficient to prejudice the Defendants, to be fair on the record. *If anybody reviews this later I'm gonna be honest. I mean it does prejudice the Defendants.* Not so much the witness 'cause [sic] I think you found your witness, correct?

COLKLEY'S COUNSEL: Yes, Your Honor, I—

THE COURT: *But they're rotting in jail waiting to get to trial which doesn't help the Defendant's, that's clear.* It doesn't help the system because I think this case mentions particularly in the more serious violent crimes the public interest demands that these cases get to trial fairly fast 'cause [sic] the public and the victims' families and everybody else, not just the Defendants, has an interest in getting these cases resolved.

But I can't find this was unreasonable. I think it was reasonable. It was reasonable, necessary and an unavoidable consequence, the nature of the case, the complexity of the case, the various situations with counsel and perhaps problems with witnesses, 'cause it does look to me like, although it's interesting, you may be right, Mr. Cardin. The postponement May 10th, there may have been behind the scenes an issue with witness availability but it appears on the record that that case was ready to go to trial and Judge Smith was ready to send it, find a, desperately search for a place to send it to trial and he gave up I think when Mr. Denholm mentioned that he was concerned about a situation with his daughter which might sort of vitiate his ability to really get it to trial.

In other words, it's a situation, I mean I'm a judge, I can tell ya [sic]. You sit there and you struggle with if I hold this and hold this and hold this, is it really gonna get to trial, 'cause you, that's your only goal in that situation and it looks like in that event, the Judge, Part 25 on that day, gave up because he realized that there were gonna start to be— that's what always happens. With two defense attorneys and a prosecutor there start to be counsel problems as the days pass on. So I'm denying the Motion for Speedy Trial.

Appellants contend that the delay is, without question, entirely attributable to the State, culminating in a nearly thirteen and one-half month wait for a trial. Previously, the prosecutor assured that he would be ready for trial, prompting the court's granting of the May 10th postponement. Nonetheless, protest appellants, the prosecutor failed to make himself available and further failed to notify the court in advance in order to allow the court to have alternative dates at the ready during the hearing. Instead, the State promised again to "reserve this date" for trial and be prepared to go forward.

The State asked for another postponement of the January 12, 2005 trial date because the prosecutor explained that *he was "doing three jobs at this point."* He explained, *"I'm doing the—I'm the District Court Chief, **I'm also still a team captain in the OSN, I'm the acting Chief [in] OSN. Which is what my problem is."*** The Assistant State's Attorney asked for "[a]ny time that I could get so that I could start doing my new job" resulting in the following exchange:

[Assistant State's Attorney]: The problem is, is that if I'm doing that, I'm not doing the other three jobs.

THE COURT: I know. But anytime you're doing this you're not going to be doing the other three jobs.

[Assistant State's Attorney]: (Inaudible) right now. Because there's been nobody in charge of this report since Monday a week ago. And I'm trying to interview people who are going to take new positions that didn't exist.

THE COURT: Right, I understand....

The Court recognized, in response to counsel's assertion that Colkley had been in jail for eighteen months, saying, "I know, it's ridiculous, I agree." The matter was postponed until March 22, 2005, over the objections of Colkley and Fields. Appellants argue that the State is fully responsible for this additional delay that they view as based on nothing more than the prosecutor's "supervisory" duties incident to his new position in the State's Attorney's office. The result was that Fields sat in jail for another approximately two and a half months which he argues should be weighed heavily against the State. Colkley argues that the indifference that the State continually displayed should be weighed heavily against it.

The Court of Appeals has recognized that delay due to negligence of the State would weigh less than a deliberate attempt to delay. *Jones,* 279 Md. at 6, 367 A.2d 1. The reasons for delay were attributed to all parties and weighed by the trial judges responsible for granting the continuances. A deliberate attempt to delay trial or hamper the defense is not reflected in the record and, although the ultimate responsibility for delays due to court unavailability and overcrowded dockets rests with the State, they are accorded less weight. *Barker,* 407 U.S. at 531, 92 S.Ct. 2182. The nature, complexity and various circumstances of witnesses and counsel all contributed to the reasons for the several delays. Nevertheless, this delay must be weighed heavily against the State, particularly in light of the reasons articulated by the State, as will be discussed more fully, *infra.*

## ASSERTION OF THE RIGHT

The *Barker* Court, in establishing guidelines for according weight to the third factor, explained:

> Whether and how a defendant asserts his right is closely related to the other factors we have mentioned. The strength of his efforts will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences. The more serious

the deprivation, the more likely a defendant is to complain. The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right. We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial. *Id.* at 531–32, 92 S.Ct. 2182.

▮ The State asserts that while Colkley diligently asserted his right to a speedy trial, Fields did not because his counsel did no more than adopt Colkley's arguments. The *Bailey* Court emphasized that failure to assert the right would make it difficult for a defendant to prove denial of a speedy trial. *Bailey,* 319 Md. at 410, 572 A.2d 544. The *Glover* Court opined that the vigorousness and timeliness of a defendant's assertion of the speedy trial right is a consideration, but cannot be deemed, "in and of itself, the *cause* for the delay; nor can it be the determining factor in whether a constitutional violation occurred." *Glover,* 368 Md. at 229, 792 A.2d 1160 (emphasis in original).

In the instant case, Fields adopted Colkley's demands to be tried promptly and, thus, asserted his right to a speedy trial. We reject the State's assertion that the adoption of Colkley's argument by Fields is insufficient to assert the right and accord it due weight favoring appellants.

### PREJUDICE TO THE DEFENDANT

Regarding this most important factor, the *Barker* Court said:

A fourth factor is prejudice to the defendant. Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the

entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past. Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown.

*Barker,* 407 U.S. at 532, 92 S.Ct. 2182 (footnote omitted).

In asserting prejudice, Fields complains that he was incarcerated upon his arrest on July 9, 2003, denied bail and, thus, remained incarcerated nearly twenty months until his trial. Unlike Colkley, nothing was holding him in jail other than the charges pending in the instant case.

We said, in *Wilson v. State,* 148 Md.App. 601, 638–39, 814 A.2d 1 (2002):

Appellants argue that they were prejudiced by the length and nature of their pre-trial incarceration. They were placed on "lockdown" because of the nature of the crimes for which they were accused and, consequently, only permitted to leave their cells for one hour each day. McCoy was in solitary confinement for the majority of his incarceration. Appellants further argue that the value of their witness testimony was diminished in value as a result of the delay.

\* \* \*

Of course, appellants endured anxiety and concern, as any normal defendant would react to the uncertainty of pre-trial status and the prospect of incarceration. Further, they, undoubtedly, experienced oppressive pre-trial incarceration and were ineligible for pre-trial release due to the heinous nature of the crimes charged and the threat they posed were they to be granted pre-trial release. The most important factor establishing prejudice, however, is the inability to prepare one's defense. Beyond a general complaint that the value of their witness testimony "was diminished," neither Wilson, Bryant, nor McCoy contend that witnesses died or specifically had faded memories due to the delay. Nor do they point to any other hindrance occasioned by their inability to have their cases tried more promptly. In view

of the complexity and gravity of the case, we accord great weight to the lack of any significant prejudice resulting from the delay.

In *Divver v. State,* 356 Md. 379, 392–93, 739 A.2d 71 (1999), the Court of Appeals opined:

> In the opinion in *Epps,* however, this Court referred to "'those personal factors' in denials of speedy trials such as interference with the defendant's liberty, the disruption of his employment, the drain of his financial resources, the curtailment of his associations, his subjection to public obloquy and the creation of anxiety in him, his family and friends." 276 Md. at 116, 345 A.2d at 75. With respect to these factors, the *Epps* Court quoted the following passage from the concurring opinion of Justice White in *Barker* where he, joined by Justice Brennan, said:
>
>> "But, for those who desire an early trial, these personal factors *should prevail if the only countervailing considerations offered by the State are those connected with crowded dockets and prosecutorial case loads.* A defendant desiring a speedy trial, therefore, should have it within some reasonable time; and only special circumstances presenting a more pressing public need with respect to the case itself should suffice to justify delay."
>
> *Id.* (quoting *Barker,* 407 U.S. at 537, 92 S.Ct. at 2195, 33 L.Ed.2d at 121 (White, J., concurring)).

A defendant's speedy trial right can be violated even absent a showing of actual prejudice. *Brady v. State,* 288 Md. 61, 62, 415 A.2d 1126 (1980). "If a defendant can show prejudice, of course, he has a stronger case for dismissal." *Jones,* 279 Md. at 17, 367 A.2d 1. Jones could show that he was denied the exculpatory testimony of three witnesses. *Id.* at 17, 367 A.2d 1. Brady was incarcerated for an additional crime for which he would have been jailed regardless of the delay and the Court of Appeals reversed our holding that absent actual prejudice, there was no speedy trial violation. *Divver,* 356 Md. at 393, 739 A.2d 71. The *Brady* Court remanded the case for application of the factors and, upon our

**544**

subsequent holding that the right to speedy was not violated, again reversed saying:

> The intermediate court equated or confused actual prejudice ... with presumed prejudice. Its conclusion was that Brady had not been able to show any prejudice, actual or presumed, and that, therefore, he was not entitled to dismissal. There was no mention of whatever offsetting weight the State's neglect played.

*Brady*, 291 Md. at 265–66, 434 A.2d 574.

The actual prejudice is factored less in Colkley's favor because he would be detained in any event and only slightly weighs in favor of Fields. Appellants offer no argument that they were prejudiced by loss of witnesses or inability to obtain records. As observed in *Brady*, we recognize that the delay in and of itself operates to erase memory of the incident. *Brady*, 291 Md. at 269, 434 A.2d 574. Possible prejudice in any delay is inherent and could also prejudice the government's case. *Glover*, 368 Md. at 231, 792 A.2d 1160.

Unlike Brady, appellants were aware of the charges in the instant case and, thus, able to assist in their defense. Other than that which is inherently prejudicial, appellants present no argument that their defense was otherwise impaired.

## BALANCING OF THE BARKER FACTORS

As to both appellants, in balancing the four factors, the State submits, "Under the circumstances herein, when the *Barker* factors are all properly assessed and balanced, including a consideration whether there was actual prejudice, there can be no doubt that Fields' and Colkley's constitutional speedy trial rights under the Sixth Amendment were not violated." We are mindful of the Supreme Court's admonition in *Barker* that, "they are related factors and must be considered together with such other circumstances as may be relevant" and "because we are dealing with a fundamental right of the accused, this process must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution." *Id.* at 533, 92 S.Ct. 2182.

Mindful of the foregoing guiding principles, we turn to the facts of the case at hand. It is stipulated by the parties that the length of the delay is sufficient to trigger an analysis of the four factors under *Barker*. We also have no difficulty concluding that both appellants have satisfied the requirement that they demand the right to a speedy trial, notwithstanding the State's argument that Fields' adoption of Colkley's assertion of the right was insufficient.

In order therefore to uphold the circuit court's denial of appellants' motions to dismiss, we must be persuaded that the remaining two factors should not be weighed heavily against the State. The State relies heavily on what it contends is the lack of any actual prejudice and, indeed, prior decisions have stressed the importance of the prejudice prong. *See Wilson v. State*, 148 Md.App. 601, 639, 814 A.2d 1 (2002). Fields is aggrieved by the fact that he was denied the benefit of having bail set and therefore remained incarcerated for twenty months, while Colkley complains that, having been convicted of another offense, a detainer was placed against him as a result of his pre-trial incarceration, resulting in his confinement in a maximum security prison, rather than being eligible for work release.

The Court, as noted, after declaring "Twenty months. I think there, just by the very nature of that type of delay there's some prejudice to the defendants" and that "the postponements appear to be, from my evaluation of the record, all reasonable," bemused, "If anybody reviews this later I'm gonna be honest, I mean, it does prejudice the defendants." [7] Neither appellant claims that his defense was impaired by destruction of evidence or unavailability or loss of memory of witnesses. Clearly, the prejudice to Colkley was not as severe because he would not have been released from confinement even if he had been allowed to post bail on the instant charges.

---

7. This reference to a "later" review is obviously the trial court's contemplation of appellate review.

Most troubling is the remaining prong, the reason for the delay. Although reasons for the several delays could be assigned to one or more parties, the overarching difficulty was that the State sought to try appellants jointly rather than sever the trial.[8] We acknowledge that a joint trial, preserving time and judicial resources, is laudable. It follows, however, that once the trial was delayed initially for legitimate reasons, the State should have redoubled its efforts to bring appellants to trial. Unfortunately, despite the fact that no court was initially available on May 10, 2004, nothing prevented the case from being transferred to the "Move List" to await commencement later in the day, notwithstanding the mere possibility that the daughter of Fields' counsel might have to present for surgery.

On July, 28, 2004, citing a myriad of issues, including that his primary officer had "gone on vacation either tonight or tomorrow" and "there are immunity issues that I need to address with the deputies in our office," the prosecutor to whom the case had been assigned for four weeks, insisted that "the State does not have the witnesses it needs to proceed today."[9] The designated administrative judge admonished the prosecutor, "If you're not ready on that date don't-well, I might be the administrative judge. It ought not be postponed again." He responded, "I will be ready on that date Your Honor."

---

8. Despite the fact that the State represented that it wished to try appellants jointly, the prosecutor told the administrative judge, on May 10, 2004, that Fields' case would take about a week and a half, that a case in which only Colkley was charged would take about a week and that she could only take one case to a courtroom at that point because she had a "much older case scheduled to begin the 24th." Apparently, the cases could have been severed.

9. At oral argument before a panel of this Court, we were unsuccessful in obtaining a response to our inquiry as to why the "primary" detective's testimony could not have been taken either before or after he took his vacation and, more importantly, why apparently obtaining from federal authorities the grant of immunity for witnesses involved more than a brief time.

Notwithstanding the State's assurances on July 28th, the designated administrative judge, exhibiting his exasperation, exhorted, ". . . if we put this in, is [the prosecutor] going to try the damn case or are we going to have more of his nonsense?" The substitute prosecutor responded, "What he said to me is, he is stacked is thought the same defendants he is in trial now right behind—that one . . . what he said to me is as long as the Admin Court doesn't send him to trial, he'll reserve this date for this case."

Before the same designated administrative judge who had presided on July 28th, the State again, on January 5, 2005, sought to postpone the January 12, 2005 trial date. Because he had been elevated from his previous position in the State's Attorney's office, the prosecutor lamented that, "I'm doing three jobs at this point. I'm doing the—I'm the District Court Chief, I'm also still a team captain in the OSN, and the acting Chief in OSN. Which is what my problem is." In further justification of his failure to be prepared for trial, he added that he needed "any time that I could get so that I can start doing my new job." When the court proposed trying the case the following week, the prosecutor responded, "The problem is, is that if I'm not doing that, I'm doing the other three jobs." When the court pointed out to him that anytime he would be trying a case before "that judge," he would not be doing the other three jobs, the prosecutor responded, "Because there's been nobody in charge of this report since Monday, a week ago and I'm trying to interview people who are going to take new positions that didn't exist."

Appellant Fields asserts that neither prosecutors nor the court should be relieved of the responsibility to ensure that the appellants' constitutional rights are protected simply because of the "handling of a large number of cases." He assails the following grounds advanced by the State to obtain post-ponements as avoidable through the exercise of "professional diligence": other administrative job functions, coordinating witness' vacation schedules for a trial scheduled two and a half months in advance and resolving "witness immunity issues"

which were not addressed for five months, which were eventually solved in one day.

The initial delays were the result of a combination of factors presented *supra* that we are prepared to accord neutral status. The delays in May, 2004, July, 2004, October 2004 and January 2005 were primarily prolonged due to the State's inability to go forward, notwithstanding defense counsel's pre-planned vacations and conflicting trials.

The reasons offered by the State in obtaining postponements in the case *sub judice*, the lack of diligence and the corresponding frustration of the administrative judge's designees are strikingly similar to *Wilson v. State*, 148 Md.App. 601, 814 A.2d 1 (2002). There, we said:

> In our view, the lack of diligence in providing counsel for Wilson and McCoy discoverable materials, including the six month delay in submitting evidence for DNA testing, would warrant a dismissal of the charges against them were they able to establish demonstrable prejudice.
>
> As we have mentioned, Wilson and McCoy are unable to establish that the delay, clearly of constitutional dimension, in any way impaired their ability to present their defense. *We are troubled at the State's handling of this case, as was Judge David Mitchell, who noted that the State "had played the discovery close to the vest" and "that the parties were coming dangerously close to a speedy trial violation."* Nevertheless, because the delay was occasioned, in part, by the request of counsel for postponements and because of the complexity and gravity of the case, we hold that the eighteen-month delay did not deny appellants their rights to a speedy trial.

(Emphasis added).

In *Wilson,* however, the reasons offered by the State for postponing the trial all related to the need for additional time to obtain critical evidence; the competing demands on the time of the prosecutor to discharge administrative or supervisory duties in running the prosecutor's office was not, in *Wilson,* as here, offered as a reason to delay the trial. The

*Barker* decision and its progeny contemplate compliance with the Court's mandate that state officials expeditiously bring criminal defendants to trial. Axiomatically, it is not contemplated by *Barker* that dismissal of criminal proceedings be routinely ordered because its dictates prove to be inconvenient to a prosecutor's busy schedule. Nor is it contemplated that the gravity of the offense have a coercive effect on trial judges who are prevailed upon to accept excuses for the lack of exercise of prosecutorial diligence, mindful that dismissal means victims would not be afforded their day in court. It is the conduct of officials charged with bringing criminal defendants to trial expeditiously that these decisions seek to modify, not the reasons to justify that conduct. Internal management decisions within the prosecutor's office, including personnel reorganization, reassignment of cases to different prosecutors and promotions involving expansion of duties can rarely be factored in as reasons to delay a trial in the *Barker* equation.[10]

The case under consideration, to be sure, involved multiple defendants represented by different counsel, recalcitrant witnesses, moderately complex issues and crowded court dockets-all of which were properly factored into the speedy trial equation. The administrative duties of the prosecuting attorney, however, are not proper considerations in an evaluation of the reasons for delaying a criminal trial and in a determination of whether a defendant has been denied the Sixth Amendment right to a speedy trial.

Notwithstanding that we find the reasons for delay troubling, as best exemplified by the exasperation of the acting administrative judges, appellants, like the appellants in *Wilson,* have not established that the delay, "clearly of constitutional dimension," impaired their ability to present their

10. Although legitimate reasons for delay should be tendered to the court, once the State deems it appropriate to proceed against a criminal defendant, it should be as impelled to insulate its production against error on appellate review as the presiding judge. The time required to accomplish personnel matters cannot serve as a reason to delay a criminal trial.

defenses. *Wilson,* 148 Md.App. at 640, 814 A.2d 1. If the record had demonstrated a purposeful delay of the trial by the State, rather than a lack of "professional diligence" and, had appellants been able to demonstrate impairment of their defenses as a result of the delay, given the unacceptable reasons, we would have no trouble concluding that they were denied their constitutional right to a speedy trial. In weighing the actual and presumed prejudice, the scales are not tipped in favor of a violation of the Sixth Amendment right to a speedy trial. We hold, therefore, that appellants were not denied their right to a speedy trial.

## III

Fields' next assignment of error is that Detective Snead's response was prejudicial when the prosecutor, on redirect examination, posed a question in response to appellant's cross-examination that required the trial judge to grant a mistrial. Fields established that the search and seizure warrant executed on his home [11] resulted in no guns or bullets that would implicate him in the shooting. The prosecutor initiated the following exchange:

[STATE]: Was anything collected?

[Detective Snead]: Yes.

[STATE]: What?

[Detective Snead]: There were eight bags of marijuana.

[FIELDS' COUNSEL]: Objection, Your Honor. May we approach.

At the bench, Fields' counsel moved for a mistrial and, when the motion was denied, counsel then asked for a curative instruction. After counsel returned to the trial tables, the court instructed the jury that "[t]he officer's testimony regarding frankly marijuana found on the premises, there's no evidence that that is connected with any of the defendants in this case, and I am going to strike it from the record, and you will please disregard it. It has nothing to do with this case."

---

11. Fields regularly slept at the location though it was a relative's home.

Fields contends that this curative instruction was insufficient to cure the prejudice to him from what he asserts is "highly prejudicial information" and a mistrial should have been granted because he was deprived of a fair trial.

"We recognize the general rule that '[w]hether to order a mistrial rests in the discretion of the trial judge, and appellate review of the denial of the motion is limited to whether there has been an abuse of discretion.'" *Goldberg v. Boone*, 167 Md.App. 410, 434, 893 A.2d 625 (2006) (citing *Medical Mut. Liab. Ins. Soc'y of Md. v. Evans*, 330 Md. 1, 19, 622 A.2d 103 (1993)). Trial courts are granted the widest discretion in the conduct of trials and we will not disturb their rulings absent clear abuse of discretion. *Plank v. Summers*, 203 Md. 552, 554–55, 102 A.2d 262 (1954); *Thrifty Diversified, Inc. v. Searles*, 48 Md.App. 605, 615, 429 A.2d 270 (1981) (discretion upheld on appellate review absent "those rare cases where there has been a clear abuse of that discretion").

"Our first question in determining abuse of discretion in denying a mistrial motion is if and to what extent the movant was prejudiced by the denial." *Owens–Corning Fiberglas Corp. v. Garrett*, 343 Md. 500, 518, 682 A.2d 1143 (1996). Where the evidence is so prejudicial that, overall, it denied the movant a fair trial, a mistrial should have been granted. *Id.* (despite improper remarks in plaintiff's closing argument, overall the defendants were not unduly prejudiced).

As the Court of Appeals stated in *Evans* and repeated most recently in *ACandS, Inc. v. Godwin*, 340 Md. 334, 667 A.2d 116 (1995), "'Where the [motion for a mistrial] is denied and the trial judge gives a curative instruction, we must determine whether the evidence was so prejudicial that it denied the defendant a fair trial; that is, whether the damage in the form of prejudice to the defendant transcended the curative effect of the instruction.'" *Id.* at 407, 667 A.2d 116 (citing *Evans*, 330 Md. at 19, 622 A.2d 103).

Fields contends that the instruction is insufficient to cure the harm in the case at bar because the entire thrust of his case was to undermine the credibility of the prosecution's

witnesses. Using Waddell's testimony as an example, Fields argues that he sought, through cross-examination, to attack Waddell's truthfulness by showing that he wanted to get out of jail to continue using drugs and, thus, his statement to police was only to achieve that end.

In Fields' view, the statement by Detective Snead undoubtedly undermined that effort by giving Waddell's testimony credibility, that he bought marijuana from Fields. Thus, the jury could not have ignored the testimony regardless of the trial judge's admonition to do so. We disagree.

Applying a list of non-exclusive factors it set forth, the Court of Appeals in *Kosmas* held that a mistrial should have been declared when a witness referred to the defendant's refusal to take a lie detector test. *Kosmas v. State,* 316 Md. 587, 594, 560 A.2d 1137 (1989) (holding that the case was not overwhelmingly against Kosmas and its determination hinged on the jury's credibility determination).

In the instant case, several witnesses had given the same account of the shooting. All but Lee retracted that testimony when on the witness stand at trial. When nearly identical evidence was presented by other witnesses, we have held that any prejudice was cured by an instruction. *Webster v. State,* 151 Md.App. 527, 557, 827 A.2d 910 (2003) (upholding denial of a motion for mistrial where nearly identical evidence was admitted through a videotaped interview any other testimony). The curative instruction sufficiently addressed Fields' objection and the court did not err in denying his motion for mistrial.

## IV

Colkley next complains that admission of testimony that David Courts, the brother of shooting victim William Courts, was killed on May 30, 2003, was erroneous. The testimony, he says, was unfairly prejudicial, because the jury might draw a connection between the death of David Courts and statements made by Colkley after his arrest that he was "going to beat these bodies," meaning that he would beat the

murder charges, *i.e.*, the murders of Bowens and David Courts. Colkley had been arrested and charged with murder in connection with the death of David Courts, but his case was eventually dismissed and he now contends that any evidence of the death of David Courts constitutes inadmissible "other crimes" evidence.

The subject of the killing of David Courts was introduced into the proceedings during the testimony of Waddell who, after disavowing his statement to police that he had observed Colkley and Fields alight from a vehicle and shoot Bowen and William Courts, was asked whether he had been friends with David Courts. He responded that, "I don't got friends. I don't trust nobody." The trial judge overruled the objections of defense counsel when Waddell was asked, on redirect examination, whether he had been in the car with David Courts on May 30, 2003 when, as Courts was driving, he was shot and killed. Waddell testified that Courts lost control of the vehicle, hitting a bridge abutment and he was thereafter transported to a hospital.

Notwithstanding Colkley's arguments to the trial court, and on appeal, that his statement, "I'm going beat these bodies" would be naturally interpreted as referring to the two murders, the lower court surmised that the jury just as well may have thought that "bodies" referred to the multiple victims of the May 28 shooting which form the subject of the instant appeal.

The line of questioning was relevant to rebut Waddell's attempt to repudiate his earlier identifications of Colkley and Fields as the gunmen who murdered Bowen and wounded Hollie and William Courts. It was appropriate for the prosecutor, after introduction of Waddell's taped statement, to offer evidence to explain the reason for the witness' recantation.

# V

Appellant Colkley next contends that the trial court erred in allowing a witness to testify as to a matter that invaded the province of the jury and in allowing a lay witness to offer his

opinion about the significance of gunshot residue on the victim's hands.

## A

Colkley is aggrieved by the response of Sergeant Massey on cross-examination, in which the witness indicated his belief that the 9 millimeter bullet casing found at the scene came from one of two guns during the course of the shooting. In pressing Sergeant Massey, as to the possibility that Campbell, a State's witness, had shot the deceased, the following colloquy transpired:

[COLKLEY'S COUNSEL]: What kind of bullet, what kind of casings were found around him?

[SERGEANT MASSEY]: Semi-automatic.

[COLKLEY'S COUNSEL]: And what type of semiautomatic? Was it a 45, a 40, a 10 millimeter was it a 9 millimeter?

[SERGEANT MASSEY]: I have to correct myself because you brought this point out very well earlier.

[COLKLEY'S COUNSEL]: I'm asking you a question, sir.

[SERGEANT MASSEY]: The question was, where was he found. Mr. Campbell wasn't found around any bullets. You [sic] talking about—

[THE COURT]: I think the question was what caliber casings were found around the bicycle where you think he was standing.

[SERGEANT MASSEY]: Oh, Okay. They were, I believe, 9 millimeters.

[COLKLEY'S COUNSEL]: What was found in the body of the deceased in this case?

[SERGEANT MASSEY]: 9 millimeter.

[COLKLEY'S COUNSEL]: Can you tell the jury for a fact what gun it came from?

One of two people's guns.

[COLKLEY'S COUNSEL]: Not one or two. I said which gun?

[SERGEANT MASSEY]: One of these two's guns.

Counsel for both Colkley and Fields objected and, at a bench conference, made motions to strike Sergeant Massey's answer and motions for mistrial. In denying both motions made by counsel, the court chided counsel for asking "stupid open-ended questions, with all due respect." We reject any suggestion that the testimony, elicited by Colkley's counsel, in any way compares with the testimony elicited in *Bohnert v. State*, 312 Md. 266, 539 A.2d 657 (1988), where a social worker was permitted to render her opinion that the prosecuting witness was, in fact, a victim of sexual abuse, thereby declaring that an act of sexual abuse had occurred inferring the defendant's guilt. Without putting too fine a point on the court's admonishment, counsel should be wary of unanticipated answers to prodding, relentless questioning.

**B**

Colkley next complains about the following response from Sergeant Massey to the prosecutor's questions:

[PROSECUTOR]: The GSR that counsel was referring to, [Colkley's Counsel] in particular, does the presence of gunshot residue on a person's hands for instance Mr. Court's' hands, has anyone suggested that is proof that he fired a gun?

[COLKLEY'S COUNSEL]: Objection.

[THE COURT]: You guys asked all about this even though the witness was never qualified as an expert in this area. If you know, I'll let you answer in fairness.

[SERGEANT MASSEY]: If you can ask the question again, I'm sorry.

[PROSECUTOR]: Is the presence of gunshot residue on Mr. Courts hands proof that he fired a gun?

[SERGEANT MASSEY]: Not at all. [PROSECUTOR]: What does that indicate?

[SERGEANT MASSEY]: That he was in close proximity at the time the weapon was fired.

As with the previous issue, Colkley's complaint stems from aggressive advocacy in which counsel explored at great length the significance of ballistics and gunshot residue in an attempt to show that others had fired the shots which wounded the two victims and killed the third. Moreover, Colkley's complaint that Sergeant Massey had never been qualified as an expert witness rings hollow when it was he who had initiated the inquiry about which he now complains. We perceive the court's ruling no more than a proper exercise of the court's discretion as to the admission of evidence.

## VI

Appellant Colkley's final assignment of error is that, because there was no evidence of any prior contact between the gunman and Courts, who denied knowing them or any specific plan to kill him, and further, because there was no evidence as to the defendant's actions prior to the shooting, there was thus no evidence that an agreement had been reached.

The Court of Appeals, in *State v. Johnson,* 367 Md. 418, 424, 788 A.2d 628 (2002), has defined a conspiracy as

the agreement between two or more people to achieve some unlawful purpose or to employ unlawful means in achieving a lawful purpose.

The essence of a criminal conspiracy is an unlawful agreement. The agreement need not be formal or spoken, provided there is a meeting of the minds reflecting a unity of purpose and design. In Maryland, the crime is complete when the unlawful agreement is reached, and no overt act in furtherance of the agreement need be shown. (Citations omitted).

In *Jones v. State,* 132 Md.App. 657, 660–61, 753 A.2d 587 (2000), the Court further explicated the nature of an agreement constituting conspiracy:

A thin line may sometimes separate 1) joint participation as a second-degree principal aiding and abetting the first-degree principal in the perpetration of a crime and 2) an

antecedent agreement to cooperate in that fashion. Theoretically, one might decide on the spur of the moment to aid and abet another in a crime without ever having been solicited to do so and without any even implicit understanding between the parties. In such a case, there would be joint participation but no antecedent conspiracy. More frequently, however, joint participation by two or more codefendants and a conspiracy, to wit, a mutual understanding, jointly to participate overlap. The former gives rise at least to a permitted inference of the latter. In this case, it is the evidentiary fact of the appellant's joint participation with another in a murder that is the predicate for the permitted inference of an antecedent agreement between the two so to coordinate their efforts.

The trial court found the existence of a conspiracy from "all of the facts of the case, the driving up, the opening of the doors, the stepping out of the car, and then the hail of gunfire that ensued, could only reasonably have been the product of a joint event on behalf of various people involved, only two of whom are actually here."

It strains credulity that this well orchestrated assassination was not preceded by prior planning. Moreover, the actions of Colkley and Fields as described in the testimony demonstrates a concert of action between the participants. We have no trouble concluding that the evidence established a conspiracy between appellants and their cohorts.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED; CASE REMANDED FOR FURTHER PROCEEDINGS.**

**COSTS TO BE PAID BY MAYOR AND CITY COUNCIL OF BALTIMORE.**